## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TRACEY WEIDOW,** | **CASE NO. 4:15-cv-00765- GBC** |
| **Plaintiff,** | **MAGISTRATE JUDGE COHN** |
| **v.** | **MEMORANDUM** |
| **CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY,** | |
| **Defendant.** | **Doc. 1, 10, 11, 18, 20, 23** |

## I.    Procedural Background

On October 30, 2009, a prior ALJ denied Plaintiff benefits under the Social Security Act. (Tr. 120). On November 19, 2010, Plaintiff applied again for supplemental security income ("SSI").    (Tr. 14). On June 23, 2011, the Bureau of Disability Determination denied this application, (Tr. 121-34) and Plaintiff requested a hearing. (Tr. 135-37). On November 14, 2012, an administrative law judge ("ALJ") held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 61-110). On April 11, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-31). Plaintiff requested review with the Appeals Council (Tr. 10), which the Appeals Council denied on February 24, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On April 20, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On June 17, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On October 27, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 18). On November 27, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 20). On January 29, 2016, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 23). On January 11, 2016, the case was referred to the undersigned Magistrate Judge. On August 3, 2016, the parties consented to adjudication by the undersigned Magistrate Judge. (Doc. 28). The matter is now ripe for review.

## II.    Standard of Review and Sequential Evaluation Process

To receive DIB or SSI, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *Id.* The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *Id.* Before step four, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). *Id.*

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A). Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory

diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

### III.    Relevant Facts in the Record

A prior decision operates as res judicata with regard to facts prior to October 30, 2009. (Tr. 120). Plaintiff limits her appeal in this case to mental impairments. (Pl. Brief); (Pl. Reply). The prior ALJ summarized Plaintiff's mental impairments as:

> In terms of the claimant's alleged psychiatric impairment; the medical evidence of record shows minimal impact. Treatment notes from Northeast Counseling Services show that from July 2007 through the last note of April 2009, the claimant describes herself as "doing well" and was "doing fine" (See Exhibits CF8 at 4,5, and 8; and F17 at 11, 16, 18, and 19). There are no side effects from her medication. There is some mention of social anxiety, and accordingly, the undersigned is limiting her work with things and not people. In sum, the above residual functional capacity assessment is supported by the record as a whole.

(Tr. 119). Plaintiff continued reporting that she was "doing well" with no medication side effects, psychoses, lethality, mania, or mood swings, exhibited normal mental status examination findings, and was assessed a GAF of 65 through June of 2010, which indicates that neither Plaintiff's symptoms nor functional impairment were more than mild. (Tr. 401-04). *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014).

On August 9, 2010, shortly before Plaintiff re-applied for benefits under the Act, she followed-up with psychiatrist Dr. Rakesh Sharma, M.D., at Northeast Counseling Services. (Tr. 361). Plaintiff had been treating with Northeast Counseling Services since 2005. (Tr. 362-68).  Dr. Sharma noted:

> The patient was seen today for follow up. She reports that she bas been having some stress because of problems with her sister. Apparently, her

boyfriend has been accused of touching her niece. She says although nothing has happened legally, at this point, but it is very aggravating. She says that sometimes she is very irritated but she reports that overall, she has done well. She is taking her Prozac and she uses Xanax once in a while. She denies any loss of interest, motivation or suicidal thinking.

ON EXAMINATION: the patient is alert, ambulatory and cooperative in the interview. She is coherent and relevant. Describes her mood as okay. Affect is appropriate to content of thought. Denies any suicidal or homicidal thinking, intent to plan. There is no evidence of psychosis. Impulse control is good. Judgment and insight is good.

DIAGNOSTIC IMPRESSION: Dysthymia, Social Phobia

RECOMMENDATION: Continue with Prozac and Xanax. Follow up will be in 2 months. She says that she maybe uses Xanax, 1 tablet a day, sometimes. She was given a 1-month supply of Xanax and a 2-month supply of Prozac.

(Tr. 361). The next month, Plaintiff's primary care provider noted "no psychological symptoms." (Tr. 259).

On May 3, 2011, Plaintiff underwent a consultative examination with Dr. Jeffrey Fremont, Ph.D. (Tr. 291). Plaintiff reported problems with personal care, that she had never had a license, had never worked, and lived with her mother and boyfriend, who was "on Disability." (Tr. 291-92). Plaintiff arrived with a social worker. (Tr. 291). Plaintiff reported depression, hyperventilation and anxiety around people and that Klonopin made her tired. (Tr. 291). She denied ever being hospitalized. (Tr. 291). Mental status examination indicated:

Her mental status reveals that she was alert and oriented x3. Cognitions were concrete. She complains of sleep disturbance and her appetite varies. She denies the use of tobacco, alcohol or drugs. She denies suicidal ideation. Her

general appearance was within normal limits. Her behavior and psychomotor activity were appropriate. Her speech was also within normal limits.

Her mood was depressed and affect was flat. It certainly was appropriate to her mood. She denies perceptual disturbances. Her stream of thought was productive and displayed continuity. There was no language impairment. Her content of thought was without preoccupation or thought disturbance.

Her abstract thinking was limited. She could not identify any paired word associations nor could she identify any simple analogies. Her fund of information was poor. She could spell the word "world" forward but not in reverse. She could count by 2's and 3's very slowly. She needed to use her fingers. She counted forward by 7's, again, using her fingers and spontaneously discontinued after the number 21. She could do very basic single digit addition but not multiplication or division. She could also do very basic single digit subtraction. She was oriented in all three spheres.

Her memory indicated there was no difficulty with her remote, recent past or recent memory. Her immediate retention and recall indicated she could remember 4 unrelated digits in the forward direction and 3 unrelated digits in reverse. No sign of any impulse control difficulties. Her social judgment is questionable and her test judgment was poor. She could identify only l out of 3 examples. She has almost no insight but does seem to be reliable.

(Tr. 292).

Dr. Fremont diagnosed mood disorder, not otherwise specified, anxiety, and rule out learning difficulty. (Tr. 292-93). Dr. Fremont assessed a GAF of 55, which indicates that neither Plaintiff's symptoms nor functional impairment are more than moderate. (Tr. 293). *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014). Dr. Fremont did not complete an RFC assessment. Doc. 11. Dr. Fremont opined that Plaintiff's functional abilities were poor, fair to poor, fair, or good, but does not define any of these terms. (Tr. 293-94). Dr. Fremont did not assess whether Plaintiff

met or equaled a Listing. Doc. 11. Dr. Fremont memorialized Plaintiff's subjective report

of function:

> The effect of her impairment on function indicates that she does very little.
> She shops only occasionally and if accompanied by someone. She cannot
> pay bills. She cannot cook but is able to warm soup. She will not use the
> microwave. She does not clean nor does she do the dishes. She simply sits
> all day. Does not read; does not watch television. She does not socialize and
> does not talk to neighbors. She does play games on the computer but does
> not know how to look up information or check e-mails on the computer.

(Tr. 293).

Plaintiff also underwent a physical consultative examination in May of 2011. (Tr.

315-18). At that examination, Plaintiff reported that she was "physically independent,"

"makes her own coffee," climbs stairs, and receives help from her fiancé and an agency.

(Tr. 314-15). Plaintiff "denied that she ever had an MRI because she said six weeks of

physical therapy was recommended before ordering the MRl and she did not go through

the physical therapy in the first place." (Tr. 314). Plaintiff reported back "pain at the time

of the exam sitting in the chair is 8 to 9 over 10 in severity" and "bilateral feet pain and

ankle pain for five to six years. She said at the time of the exam, the pain is 9 over 10 in

severity and the pain she says is 'unbearable.'" (Tr. 314). With regard to carpal tunnel

syndrome and hand pain, "does not use wrist splints and denied that surgical intervention

was recommended." (Tr. 314). The examiner noted "she is in no apparent physical

distress, sitting in the chair. Sometimes actually was smiling even when she claimed the

pain as 9/ 10 as severity and unbearable. She actually commented on that by saying that 'you learn to live with it.'" (Tr. 315).

On May 12, 2011, state agency consultant Dr. Francis Murphy, Ph.D., reviewed Plaintiff's file, including Dr. Fremont's opinion, and authored an RFC assessment and Listings analysis. (Tr. 295-311). Dr. Murphy opined that Plaintiff had mild limitation in activities of daily living and moderate limitations in concentration, persistence, or pace and social functioning. (Tr. 309). Dr. Murphy opined that Plaintiff had no more than moderate limitations in specific work-related functions. (Tr. 295-96). Dr. Murphy noted that Plaintiff's activities of daily living "are generally okay." (Tr. 311). Dr. Murphy noted that the field office noted no problems during the interview, Plaintiff had never been hospitalized for psychiatric reasons, "mental status was entirely unremarkable" in treatment records, and providers assessed a GAF of 65. (Tr. 311). Dr. Murphy explained:

> The claimant can perform simple, routine, repetitive work in a stable environment. She could be expected to complete a normal workweek without exacerbation of psychological symptoms. She is capable of asking simple questions and accepting instruction. She retains the ability to perform repetitive work activities without constant supervision. There are no restrictions in her abilities in regards to adaptation.
>
> Based on the evidence of record, the claimant's statements are found to be partially credible.
>
> The claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment.

(Tr. 297).

Dr. Murphy accurately characterized the records from November of 2010 to May of 2011, as Plaintiff reported stress due to accusations of molestation against her boyfriend but denied lethality, psychoses, and hopelessness, reported her medications (Klonopin and Prozac) were working, and mental status examinations were normal. (Tr. 394-400). The only exception are treatment plan updates from December 21, 2010 and May of 2011 when Plaintiff reported depressive symptoms of crying, isolating, and irritability, along with anxiety symptoms of racing heart, sweating, and shaking, and that she worried "about everything." (Tr. 447-48). However, these records do not contain any objective findings or change in diagnoses or treatment. (Tr. 447-48). In January of 2011, Plaintiff submitted a Function Report indicating that she did not take part in anything, had social phobia, could not pay attention for long, did not finish what she started, could follow written but not spoken instructions, became nervous around authority figures, and did not handle stress or changes in routine well "at all." (Tr. 199). The only mental status examinations during this period indicated that Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect and euthymic mood, anxiety only "at times," she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, and her sleep was normal. (Tr. 394-400).

On June 3, 2011, Plaintiff had a twenty-two minute medication management session with CRNP O'Boyle. (Tr. 328). Plaintiff was "doing the same. Stressors same but coping…able to verbalize feelings." (Tr. 328). Examination indicated that Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect and euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, and her eye contact was good. (Tr. 328). CRNP O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 55, and continued Plaintiff's medications. (Tr. 328). Plaintiff would remain on a combination of Prozac, Klonopin, and Trazodone throughout the relevant period. (Tr. 348-49, 375-78).

On June 30, 2011 and July 28, 2011, Plaintiff followed-up with CRNP O'Boyle. (Tr. 391-92). Plaintiff had reported a former friend to the police for harassment but "denied lethality, psychosis, or feelings of hopelessness or helplessness" with "just anxiety at times which is understandable." (Tr. 391-92). Plaintiff felt "current medicine is working" and reported stressors related to her boyfriend but felt "he will be found not guilty." (Tr. 391). Plaintiff used trazodone "only infrequently." (Tr. 392).  Examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic mood, she denied hallucinations, delusions, suicidality,

and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 391-92). CRNP O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's medications. (Tr. 391-92).

In September of 2011, Plaintiff's treatment plan was updated and she reported severe symptoms, depression, lack of motivation, episodes of crying, anxiety with heart palpitations, hot flashes, and shaking legs, and severe daily worry. (Tr. 445-46).

On October 27, 2011, Plaintiff followed-up with Dr. Sharma for a fifteen minute medication management session. (Tr. 357, 390). Dr. Sharma noted:

> The patient was seen today for a follow-up. The patient reports that she has been under a lot of stress. She reports that her house was flooded and her boyfriend has been charged with a crime and he is supposed to go for a jury trial in April. The patient reports that has been having fluctuating moods sometimes she is feeling okay and other times feeling depressed with loss of interest and motivation, irritability. She reports that currently she is residing with her sister and there are too many people living there and she gets frustrated. Some tearfulness is reported. No suicidal thinking is reported.
>
> MENTAL STATUS EXAMINATION: The patient was alert, ambulatory and cooperative with the interview. The patient is coherent and relevant. Speech is normal in rate, rhythm and volume. Mood is described as sometimes depressed. Affect is appropriate to content of thought. She denies any suicidal or homicidal idea's, intents or plans; Auditory and visual hallucinations were denied. No delusional thinking is noted. The patient is not exhibiting any loose associations or flight of idea's. The patient remains oriented into three spheres. Impulse control is good. Judgment and insight is good.

(Tr. 357).

On November 22, 2011, Plaintiff followed-up with CRNP O'Boyle. (Tr. 389). Plaintiff "denied lethality, psychosis, mood swings or depression" and was pleased that missionaries had helped clean her home after a flood. (Tr. 389).  Examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 389). CRNP O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's medications. (Tr. 389).

On December 21, 2011, Plaintiff followed-up with CRNP O'Boyle. (Tr. 388). Plaintiff reported she "feels medication is working and having no side effects. In FEMA trailer since last Thursday. No…feelings of helplessness or hopelessness. Able to verbalize feelings. Sleeping better now and no appetite change." (Tr. 388). She "denied lethality, psychosis, mood swings or depression." (Tr. 388). Examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 388). CRNP

O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's medications. (Tr. 388).

On January 5, 2012, Plaintiff's therapy treatment plan was updated and she reported "severe" depression with no energy or motivation, mostly related to ongoing stress, with anxiety, heart palpitations, and hot flashes, and had many stressful situations in her life. (Tr. 444).

On January 19, 2012, Plaintiff followed-up with CRNP O'Boyle. (Tr. 387). Plaintiff reported she "feels she is doing well even with all the craziness in her life. Pleased she has her therapist who she sees weekly and can call as needed. Getting things together now after flood. Feels current medications are fine because stressors are all situational. ICM continues involvement and…finally scheduled appointment for [gynecologist]…denies lethality, pscyhosis, mood swings or depression. No medication side effects." (Tr. 387). Examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 387). CRNP O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's medications. (Tr. 387).

On February 16, 2012, Plaintiff followed-up with CRNP O'Boyle. (Tr. 386). Plaintiff was anxious because she had an appointment scheduled later that day with her gynecologist to discuss a biopsy  but "denied lethality, psychosis, mood swings or depression, just 'normal anxiety.'" (Tr. 386). Plaintiff denied medication side effects but had been missing some medication because she forgot to take them. (Tr. 386). Examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 386). CRNP O'Boyle diagnosed dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's medications. (Tr. 385).

On March 15, 2012, Plaintiff followed-up with CRNP O'Boyle. (Tr. 385). Plaintiff was "naturally anxious" about an upcoming hysterectomy but "denied lethality, psychosis, mood swings or depression, just 'normal anxiety.'" (Tr. 385). Plaintiff denied medication side effects and examination indicated Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with euthymic and anxious moods, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought

process was relevant, and her sleep was normal. (Tr. 385). CRNP O'Boyle diagnosed

dysthymia and social phobia, assessed a GAF of 65, and continued Plaintiff's

medications. (Tr. 385).

On April 16, 2012, Plaintiff followed-up with Dr. Sharma. (Tr. 384). Dr. Sharma

noted:

> The patient was seen today for this follow-up. The patient reports that she
> has been doing fairly well at present. She states that she recently had a
> hysterectomy and has been having some hot flashes but her overall moods
> have improved. She reports that she is not feeling depressed or having any
> loss of interest or motivation. Sleep and appetite remains good.
>
> MENTAL STATUS EXAMINATION: The patient is alert, ambulatory,
> cooperative with the interview, coherent and relevant. Speech is normal in
> rate, rhythm and volume. Mood is described as good. Affect is appropriate to
> content of thought. The patient denies any suicidal or homicidal idea's,
> intents or plans. Auditory and visual hallucinations were denied. No
> delusional thinking is noted. The patient is not exhibiting any loose
> associations or flight of idea's. The patient remains oriented into three
> spheres. Sensorium is clear. Impulse control is good. Judgment and insight is
> good.

(Tr. 384). Dr. Sharma continued her medications. (Tr. 384).

The next week, Plaintiff's therapy treatment plan was updated and she reported

feeling less depressed, increased energy and motivation, less crying, and was learning to

problem solve, but had anxiety constantly with heart palpitations and hot flashes. (Tr.

443).

On July 13, 2012, Plaintiff had a twenty minute medication management session

with CRNP O'Boyle. (Tr. 383). Plaintiff reported her fiancé's trial had been postponed

until October and she was stressed that her cash assistance was ending in September. (Tr. 383). She was "able to verbalize feelings," was "coping with stressors at the time with help of [her case manager]," and denied depression, mood swings, and medication side effects. (Tr. 383). Examination indicated that Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with anxious and euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her thought process was relevant, and her sleep was normal. (Tr. 383).

The next week, Plaintiff's treatment plan was updated, and she reported crying five or six times every day, had difficulty sleeping, had no interest or motivation, felt hopeless and helpless "constantly," had stress and anxiety "through the roof," had difficulty breathing and shook "constantly," and felt completely overwhelmed. (Tr. 442).

On July 31, 2012, Plaintiff had a thirty minute medication management session with CRNP O'Boyle. (Tr. 381). Plaintiff was in an emergency evaluation "because she reported feeling homicidal" after her cash assistance ended and her insurance company mistakenly denied covering her prescriptions. (Tr. 381). "It was determined that there was no homicidal thought, plan or intent, just that she was not medicating properly due to insurance coverage problems." (Tr. 381). Plaintiff "denied" mood swings and depression and reported she was "just frustrated with stressors." (Tr. 381). Examination indicated

that Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect with anxious and euthymic mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her sleep was normal, and her thought process was relevant. (Tr. 381).

On August 22, 2012, Plaintiff had a twenty minute medication management session with Dr. Rakesh Sharma, M.D. (Tr. 327, 380). Mental status examination indicated:

> The patient is alert, ambulatory, and cooperative in the interview. She is coherent and relevant. Her speech is normal in rate and volume. Her mood is described as a little anxious. Her affect is appropriate to content of thought.
>
> The patient denies any suicidal or homicidal ideas, intent or plan. She denies any auditory or visual hallucinations. No delusional thinking is noted. Her sensorium is clear. Her impulse control is good. Her judgment and insight is good.

(Tr. 327). Dr. Sharma noted:

> The patient was seen today for follow up. She reports that she has been feeling a little anxious and is under stress because of being in a FEMA trailer. She is also having conflicts with the FEMA worker. She says that she feels pressured to move back into her previous housing, which is not ready yet. The patient has an Intensive Case Manager. She says that she also comes for therapy, which has been extremely helpful. The patient reports that some days, she may have a little difficulty sleeping but she reports no persistent sad moods or any loss of interest or motivation. She is not reporting any suicidal thinking or any hopelessness. Occasionally, the anxiety would increase, where she would start worrying or thinking about

the problems that are going on to an excess and she would have some difficulty sleeping.

(Tr. 327). Plaintiff's medications were continued. (Tr. 327).

On October 26, 2012, Plaintiff followed-up with CRNP O'Boyle for a thirty minute medication management session. (Tr. 379). CRNP O'Boyle continued Plaintiff's medication but indicated that they would decrease Klonopin because she had temporarily increased Klonopin to attend her fiancé's trial. (Tr. 379). Examination indicated that Plaintiff's appearance was appropriate, not disheveled, her hygiene was good, her attitude was cooperative, motor activity was calm with no agitation, she had appropriate affect, she had euthymic, anxious, and depressed mood, she denied hallucinations, delusions, suicidality, and homicidality, her judgment was intact, her insight was good, her memory was intact, her eye contact was good, her sleep was normal, and her thought process was normal. (Tr. 328). Plaintiff denied depression and reported she was "just frustrated with stressors." (Tr. 379). CRNP O'Boyle assessed a GAF of 65 and diagnosed social phobia and dysthymia. (Tr. 379).

In November of 2012, Plaintiff appeared before the ALJ and testified to severe psychological symptoms and functional impairments. (Tr. 65). Plaintiff testified that she could not work because she had "a problem being around people." (Tr. 71). She testified that she had a seventh or eighth grade education and had failed multiple grades. (Tr. 69-70). She testified that she had no hobbies, did not watch much television, and got aggravated while playing computer games. (Tr. 74). She testified that she went with her

case manager to shop, had no friends, and did nothing during the day. (Tr. 75). She testified that she never went out to eat and never went on dates with her boyfriend. (Tr. 78). She testified that she only associated with some family members and only attended family functions accompanied by one of her sisters. (Tr. 80). She reported problems focusing and that she could only use the computer for up to fifteen minutes. (Tr. 81-82). She testified that she could not use public transportation and could not travel alone. (Tr. 87). She testified that she did not like to see Dr. Sharma and she was afraid of him. (Tr. 89). She testified that her sessions with Dr. Sharma lasted only five or ten minutes. (Tr. 89). She testified that she only saw CRNP O'Boyle for five minutes. (Tr. 90). She testified that CRNP O'Boyle did not question her on how she felt, how her week went, or how she had been in the last month. (Tr. 90). She testified that her brother had molested her when she was younger, her father was killed at a young age, and both made her more anxious and less trusting of people. (Tr. 92). She testified that she did not have hope for her life and the last time she had fun was when she was camping three years prior. (Tr. 93). She testified to problems sleeping, flashbacks, and racing thoughts. (Tr. 94). She testified to anxiety attacks, chest pains, memory problems, and trouble breathing. (Tr. 95). She testified to problems following instructions and that she got frustrated and angry when she received instruction. (Tr. 96).

On January 2, 2013, Plaintiff followed-up with CRNP O'Boyle. (Tr. 464). Plaintiff was "very upset because of all the stressors going on re: paramour's incarceration, home

not completed yet since flood, and being denied disability. Admitted to having suicidal thoughts over last week but denies any at present and says she would never act on those thoughts. [Case worker] reports frequent contacts from Tracey and Tracey's increased isolative behavior. Denies lethality, psychosis, mood swings at present but extremely tearful through session." (Tr. 464). Examination indicated appropriate, not disheveled, appearance, good hygiene, cooperative attitude, calm motor activity with no psychomotor agitation, spontaneous speech, good eye contact, intact judgment, depressed and anxious mood, appropriate affect, normal sleep, no hallucinations, relevant thought process, no delusions, and good insight with a GAF of 55. (Tr. 464). Plaintiff was referred to the partial hospitalization program. (Tr. 464).

On January 3, 2013, Plaintiff underwent an evaluation for a partial hospitalization program due to "exacerbation of symptoms (e.g. depression: isolation, no motivation [and] anxiety: panic attacks)." (Tr. 465, 470). Plaintiff was living with her eighty-three year old mother and reported "increased stress due to still living in a FEMA trailer since the flood last year." (Tr. 466). She reported flashbacks to molestation by her brother since her fiancé had been incarcerated for molesting a twelve year old girl they were babysitting. (Tr. 466). She reported "having good, supportive relationships with her sisters [and] fiancé…she talks to them frequently." (Tr. 466). She reported that her strengths included household tasks, because she "clean[s] the trailer" and "cook[s] for [herself] and [her] mom." (Tr. 469). She reported that she had no leisure activities and

few friends. (Tr. 470). Examination indicated neat appearance, good hygiene, normal motor movements with no psychomotor agitation, cooperative manner, appropriate speech, depressed and anxious mood, related affect, no hallucinations, delusions, or suicidal thoughts, unimpaired memory, "good" insight and judgment, "good" motivation, average intelligence, and present impulse control. (Tr. 473). Providers assessed a GAF of 50, with the highest GAF in the past year of 55. (Tr. 473). The evaluation was signed by staff psychiatrist Dr. Khalid Mahmood, M.D., along with Plaintiff's case worker and Gia Kent, LSW. (Tr. 481). An updated treatment plan had no change in GAF or diagnoses. (Tr. 490). Plaintiff reported slight improvement in motivation and no improvement in her other symptoms. (Tr. 486-87).

Another psychiatric evaluation from January 3, 2013 and signed by psychiatrist Dr. P.S. Sriharsha, M.D., assessed dysthymia, social phobia by history, and possible PTSD with a GAF of 50. (Tr. 463). Mental status examination indicated "the patient is awake, alert and cooperative. Gait fair. Personal hyegine is fair. The patient is overweight. Speech is clear, coherent, relevant, spontaneous, and productive. Reaction times average. Eye contact is moderate. The patient's affect is depressed. Frequently tearful. No suicidal thought or plans. No hallucinations. Short-term plans are fair. Memory functioning is good. Retention recall is good. Attention, concentration and intellectual functioning are good. Orientation is good to time, place and person. Judgment and insight are questionable." (Tr. 463). Plaintiff reported that her boyfriend's recent incarceration had

"caused a lot of problems" because "she and her mother…depended on him a great deal apparently." (Tr. 462).

On January 29, 2013, Dr. Mahmood noted that Plaintiff was "somewhat better" but had been "somewhat depressed" and that her boyfriend's incarceration "triggered her flashbacks and nightmares." (Tr. 461). Examination indicated:

> The patient was cooperative. She was talking with good eye contact. Her speech is of a normal rate, volume and rhythm. She describes her mood as feeling somewhat depressed. Affect is appropriate. Her thought is goal directed. Thought content is free of delusions. She denies auditory or visual hallucinations. She denies suicidal or homicidal thinking.

(Tr. 461).

In January of 2013, Plaintiff's case manager, Mandy Gibson, submitted an opinion in response to interrogatories. (Tr. 451). Ms. Gibson indicated that Plaintiff had been in intensive case management services since July 16, 2010. (Tr. 451). She indicated that Plaintiff "does not drive, does not own a vehicle, and experiences extreme anxiety and panic attacks in public places on her own." (Tr. 452). Ms. Gibson indicated that Plaintiff had experienced an increase in fear and anxiety since beginning the partial hospitalization program. (Tr. 453). She opined that Plaintiff had marked or extreme limitations in most areas of work-related function, although she noted that "case management is not a clinical service." (Tr. 454-56). She indicated that she had observed Plaintiff suffer panic attacks, but did not specify their frequency or severity. (Tr. 456).

In February of 2013, Lisa Wittar, LSW, completed interrogatories. (Tr. 511). Ms. Wittar opined Plaintiff would have marked or extreme impairments in working with others, making simple decisions, completing a normal workday or workweek, and performing at a consistent pace because Plaintiff "is unable to focus, hold a simple conversation with peers due to extreme anxiety…generally would sit and cry in group setting." (Tr. 505). Ms. Wittar opined that Plaintiff was markedly limited in interacting with the public, supervisors, coworkers, or peers and extremely limited in traveling to unfamiliar places, setting realistic goals, or making plans independent of others because Plaintiff "has attempted to work and is unable to follow instructions that force her out of her comfort zone (anything, anyone unfamiliar)." (Tr. 506). She opined that Plaintiff was "not limited" in preparing meals, paying household bills, managing her own funds, was moderately limited in keeping a residence clean and repaired, and markedly limited in shopping. (Tr. 506).

Ms. Wittar identified Plaintiff's diagnoses as dysthymia disorder and generalized anxiety disorder, and explained Plaintiff had "ongoing depression and anxiety symptoms frequently reported in severe range…has difficulty functioning outside her home and immediate friends and family members…has limited insight into behavior and limited coping skills, does not manage stress well…attempted limited work routine in controlled environment and did not manage well, lasting only a couple of weeks." (Tr. 501). Ms. Wittar opined that, since October of 2005, Plaintiff had "a residual disease process that

has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 511). Ms. Wittar indicated that her opinion was based on her observations, Plaintiff's reports, records from other mental health professionals, and information provided by family or friends. (Tr. 510). She opined that Plaintiff's symptoms included agoraphobia, anxiety attacks, appetite disturbance, sleep disturbance, psychomotor agitation,  panic attacks in social or stressful situation, helplessness, hopelessness, difficulty concentrating or thinking, paranoia, easy distractibility, illogical thinking, emotional withdrawal/isolation, emotional lability, apprehensive expectation, vigilance and scanning, exaggerated startle response, seclusiveness, impaired insight, and tearfulness. (Tr. 508-09).

## IV.    Plaintiff Allegations of Error

### a.  Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility. (Pl. Brief at 17). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

Plaintiff asserts that the ALJ erred in evaluating her activities of daily living to undermine her credibility. (Pl. Brief at 17); (Pl. Reply at 1). The Court assumes without deciding that the ALJ erred in evaluating activities of daily living. "[W]hether the error is harmless depends on whether the other reasons cited by the ALJ…provide substantial evidence for her decision." *Brumbaugh v. Colvin,* 3:14–CV–888, 2014 WL 5325346, at *16 (M.D.Pa. Oct. 20, 2014). The ALJ also relied on a lack of objective medical evidence, the consultative examining opinion, the non-examining, non-treating medical opinion, inconsistent claims, Plaintiff's poor work history, conservative treatment, and non-compliance with treatment. (Tr. 22-25). These rationales are accurate characterizations of the record and proper reasons to find Plaintiff less than fully credible. *See* SSR 96-7p.

The ALJ found that the lack of treatment for physical complaints and lack of findings on physical examination, despite allegations of debilitating pain, rendered Plaintiff less than fully credible. (Tr. 22-25). The ALJ properly relied on the discrepancy between Plaintiff's allegations regarding physical impairments and her conservative treatment and benign examination findings to find her less than fully credible. *See* SSR 96-7p.[1] The ALJ is authorized to consider the absence of objective findings. *Id.* ("The regulations at 20 CFR 404.1529(c)(2) and 416.929(c)(2) provide that objective medical evidence "is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of" an individual's symptoms and the effects those symptoms may have on the individual's ability to function. The examples in the regulations (reduced joint motion, muscle spasm, sensory deficit, and motor disruption) illustrate findings that may result from, or be associated with, the symptom of pain. When present, these findings tend to lend credibility to an individual's allegations about pain or other symptoms and their functional effects."). The ALJ is also authorized to consider conservative treatment. *Id.* ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or

---

[1] SSR 96-7p was superceded by SSR 16-3p on March 28, 2016, but the Court reviews the ALJ's findings based on the law in existence at the time. *See* 42 U.S.C. §405(g).

other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms. On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"). The ALJ should not rely on conservative treatment without considering other explanations for conservative treatment, like financial constraints, but Plaintiff has not offered any alternative explanation here. *Id.*; (Pl. Brief); (Pl. Reply). Plaintiff does not challenge the ALJ's reliance on conservative treatment for physical impairments or the lack of findings on physical examination. (Pl. Brief); (Pl. Reply). Plaintiff limits her appeal to mental health impairments, but the ALJ explained that these discrepancies undermined Plaintiff's credibility as a whole. (Tr. 25). Plaintiff does not demonstrate that no reasonable person would have found her less than fully credible based on the discrepancy between her allegations of "unbearable" physical pain and the lack of treatment and examination findings. (Tr. 25).

The ALJ found that Plaintiff's poor work history undermined her credibility that she was unable to work as a result of disabling medical conditions. (Tr. 23). Under ruling

96–7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about ... prior work record and efforts to work ...." SSR 96–7p; *see also Dobrowolsky v. Califano,* 606 F.2d 403 (3d Cir.1979) (Work history is a proper consideration in the credibility assessment). The ALJ accurately characterized the record as showing poor work history. Doc. 11. Plaintiff does not challenge this rationale on appeal. (Pl. Brief); (Pl. Reply). Plaintiff appears to assert that she is more credible because she was "never being able to hold a job." (Pl. Brief at 5). However, Plaintiff was previously denied benefits through October of 2009. (Tr. 120). Res judicata requires the Court to conclude that, during this time, Plaintiff was able to work. (Tr. 14).  The ALJ properly relied on Plaintiff's poor work history to find her less than fully credible. *See* SSR 96-7p.

The ALJ found that Plaintiff made inconsistent claims. The ALJ a notes the inconsistency between Plaintiff's reports to Dr. Sharma and CRNP O'Boyle with Plaintiff's reports to Ms. Wittar. Plaintiff contends that these discrepancies exist because she only saw Dr. Sharma and Ms. Wittar for short medication management checks every few months, while she saw Ms. Wittar much more frequently. (Pl. Brief). This could explain a lack of complaints in Dr. Sharma and CRNP O'Boyle's records, but not Plaintiff's affirmative denial of complaints in these records.  The ALJ notes that Plaintiff

affirmatively reported that she was "doing well and complaining of no major depressive symptoms or mood swings," reported good sleep and appetite, walking for exercise to lose weight, had only "occasional anxiety and worry" with "no persistent sad moods, or any loss of interest or motivation," and was "just frustrated with stressors involving her boyfriend," who was incarcerated. (Tr. 22-23).

Plaintiff's brief asserts that she is afraid of Dr. Sharma, but that still does not explain the discrepancies. (Pl. Brief). No medical records contain Plaintiff's claim that she is afraid of Dr. Sharma, and she only testified that she was afraid of Dr. Sharma upon prompting from her attorney. (Tr. 89). Moreover, the ALJ also relied on Plaintiff's inconsistent claims regarding molestation by her brother; Plaintiff alternatively reported molestation by her brother and denied molestation by her brother. (Tr. 24). Plaintiff does not provide any explanation for this inconsistency on appeal. (Pl. Brief); (Pl. Reply). The Court also notes that Plaintiff reported much more restrictive activities of daily living in support of her application for benefits than she did to treating providers. For instance, she testified in November of 2012 that she did not cook and only performed "light cleaning," (Tr. 73).   In contrast, two months later, she reported during her intake for partial hospitalization that her strengths included household tasks, because she "clean[s] the trailer" and "cook[s] for [herself] and [her] mom." (Tr. 466, 469).

The ALJ also relied on Dr. Murphy's opinion, Dr. Freemont's GAF score of 55, and GAF scores of 55 or above from treating providers except for a short duration after

her boyfriend was incarcerated. (Tr. 22-25). As discussed below, the ALJ properly evaluated the opinion evidence and relied on these opinions. *Infra*. These opinions also lend credence to the ALJ's conclusion regarding a lack of objective evidence to support greater mental health limitations. (Tr. 22-23) ("mental exams are within normal limits…mental status examinations continued to be within normal limits and her GAF scores continued to be noted at 65, even at the emergency evaluation").

The ALJ is entitled to deference with regard to credibility determinations. *See Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations") (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Plaintiff cannot demonstrate that no reasonable person would have relied on the lack of objective medical evidence, the consultative examining opinion, the non-examining, non-treating medical opinion, inconsistent claims, Plaintiff's poor work history, conservative treatment, and non-compliance with treatment to find that Plaintiff was less than fully credible. *Reefer v.*

*Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). The Court does not remand on these grounds.

### b. Medical Opinions

The record contains no treating source medical opinions supporting Plaintiff's claim for benefits. Doc. 11. At one point, Plaintiff's psychiatrist assessed a GAF of 50. (Tr. 463). However, a GAF of 50 does not necessarily support disability, because it means that either Plaintiff's symptoms or functional impairment were severe. This is because:

> The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two.

*Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014). Thus, a GAF score of 60 indicates that neither the claimant's function nor symptoms are more than mild. *Id.* In contrast, a GAF score of 50 indicates that either the claimant's function or symptoms are severe, but not necessarily both. *Id.* ("[A]suicidal patient who is gainfully employed would have a GAF rating below 20."). In other words, a GAF of 65 would affirmatively support the ALJ because Plaintiff's functional

impairment could not be more than mild, while a GAF of 50 could support disability or non-disability. *Id.* Moreover, the ALJ explained that the GAF of 50 occurred during an exacerbation of symptoms that was not expected to last for twelve months or more. (Tr. 23) ("No significant weight is given to the GAF score of 50. The GAF of 50 is consistent with her entry to the partial program due to the temporary increase in symptoms due to stressors; however, her overall GAF scores were 55 and above, and there is an expectation of improvement with her release from the partial program expected in March 2013. Thus, greater weight is given to the GAF of 55 and no significant weight is given to the GAF of 50."). There was no treating source medical opinion that Plaintiff suffered disabling limitations under the definition of the Act, which requires a twelve month duration. *Id.*

Only acceptable medical sources can be treating sources or submit medical opinions. *See* SSR 06-3p. Plaintiff asserts that "the reality of the public mental health system" is such that unacceptable medical sources provide the majority of treatment. (Pl. Brief at 16). However, the Court is constrained by the Regulations and SSR 06-3p, and cannot consider Ms. Wittar a treating source. *See* 20 C.F.R. §404.1527(a); SSR 06-3p. Plaintiff cites a variety of cases that apply to treating sources and the treating source rule, but there were no opinions entitled to the treating source rule before the ALJ. (Pl. Brief at 19-20).

Plaintiff's failure to submit treating source medical opinions is significant because the ALJ must comply with heightened requirements to reject treating source medical opinions, but these requirements do not apply to other opinions. *See* 20 C.F.R. §404.1527(c)(2) (ALJ must assign controlling weight to some treating source medical opinions and must provide "good reasons" for the assignment of weight when they are not entitled to controlling weight). When the ALJ does not assign controlling weight to a treating source opinion, ALJ applies the factors in 20 C.F.R. §404.1527(c). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." *Id.*

The ALJ relied in part on both non-treating opinions, writing:

Dr. Freemont noted diagnoses of mood disorder and anxiety, and he noted a GAF score of 55, indicating no more than moderate symptoms and

limitations. The undersigned gives great weight to this GAF score of 55 because it is consistent with the longitudinal evidence of record and the records from treating sources, which demonstrate no more than mild to moderate symptoms. Dr. Freemont obtained a detailed history and performed a detailed mental status examination. Thus, this assessment is given great weight.

…

Dr. Murphy indicated that claimant has moderate limitations in understanding, remembering, and carrying out detailed instmctions; moderate limitations in working in proximity to others; and moderate limitations in social interaction. Overall, Dr. Murphy indicated that claimant could meet the basic mental demands of competitive work on a sustained basis despite the limitations arising as a result of her impairments. This assessment is consistent with the longitudinal evidence of record and the records from her treating psychiatrist/nurse practitioner, which demonstrate no more than moderate limitations. Therefore, the undersigned has given Dr. Murphy's assessment great weight.

…

Dr. Freemont indicated that claimant had a fair to poor ability in all areas of occupational, performance, and social adjustments. He also noted a GAF score of 55, indicating moderate limitations in functioning. The undersigned agrees with this assessment to the extent it supports that claimant has no more than moderate mental functional limitations. The indications of fair to poor abilities are inconsistent with the longitudinal record and appear to be based on claimant's subjective complaints. Therefore, the undersigned has given this assessment only some weight.

(Tr. 23-25).

SSR 06-3p requires the ALJ to "evaluate" opinions from medical sources who are

not acceptable medical sources. *Id.* The ALJ complied with SSR 06-3p with regard to

Ms. Wittar and Ms. Gibson, writing:

The undersigned has considered the medical source statements of Mandy Gibson (claimant's social worker) and Lisa Wittar (claimant'S outpatient

psychotherapist) (Exhibits D13F, D16F). Ms. Gibson and Ms. Wittar provided answers to interrogatories concerning claimant's mental functioning. Both indicated marked and extreme limitations in almost every area of work-related mental functioning. However, Ms. Wittar also indicated that claimant had no limitations in understanding, remembering, and carrying out short, simple instructions. The undersigned notes that such marked and extreme limitations are inconsistent with the longitudinal record as a whole, including her treating psychiatrist and nurse practitioner. Furthermore, Ms. Gibson and Ms. Wittar are not psychiatrists or psychologists trained in evaluating mental functioning. Thus, these marked/extreme limitations are given no significant weight in evaluating the claimant's residual functional capacity.

(Tr. 25).

Plaintiff asserts that the "the ALJ basically ignored or dismissed the abundance of evidence favorable to the claimant from Ms. Wittar and Gibson. There was no rational reason provided for such dismissal of critical evidence, in order to rely on the opinion a nonwexamining psychologist, and a twisted review of the "facts.'" (Pl. Brief at 8). As noted above, the ALJ did not "ignore" this evidence, but acknowledged it, evaluated it, and concluded that it was inconsistent with Dr. Murphy's opinion and Dr. Sharma's treatment notes. (Tr. 25). These are rational reasons, particularly combined with the reasonable finding described above that Plaintiff's testimony was not fully credible. *Supra*. With regard to Ms. Gibson, her opinion is of limited probative value. She declined to provide clinical findings. (Tr. 452-53, 456). Ms. Gibson noted that Plaintiff had panic attacks in public "on her own," but Ms. Gibson could not personally observe Plaintiff while she was on her own, so this opinion is based on Plaintiff's subjective claims, which were less than fully credible. *Supra*. Ms. Gibson also indicated that she had observed

Plaintiff suffer panic attacks, but did not specify the nature, frequency, or triggering environments of those panic attacks. (Tr. 456). With regard to Ms. Wittar, the ALJ properly found that her opinion was inconsistent with the longitudinal record. Ms. Wittar identified symptoms that were either absent from or affirmatively denied in the treatment records. For instance, like Dr. Fremont, she indicated that Plaintiff had limited insight and poor appetite and sleep. (Tr. 509-09). As discussed below, those observations are contradicted by almost every treatment record and mental status examination during the relevant period. *Infra.* Similarly, Ms. Wittar identified psychomotor agitation. (Tr. 508-09). Plaintiff reported physical shakiness in her treatment plans and to Dr. Fremont, but every mental status examination conducted by Dr. Sharma and CRNP O'Boyle indicated calm psychomotor activity with no agitation. (Tr. 379-99, 464, 473). Ms. Wittar identified difficulty concentrating and illogical thinking, but all of the mental status examinations by Dr. Sharma and CRNP O'Boyle indicated normal thought process. (Tr. 379-99, 464, 473). Even on intake to the partial hospitalization program, the examining psychiatrist observed "[a]ttention, concentration and intellectual functioning are good." (Tr. 463). Ms. Wittar opined that Plaintiff's symptoms had been disabling since October of 2005, but this contradicts the prior ALJ's finding that they were not disabling through at least October of 2009. (Tr. 120). Plaintiff cannot demonstrate that no reasonable person would have assigned these opinions no significant weight. *Reefer v. Barnhart*, 326 F.3d

376, 379 (3d Cir. 2003). Plaintiff's alleged fear of Dr. Sharma is insufficient to meet this burden. *Id.*

Plaintiff asserts that the ALJ erred in assessing Dr. Fremont's opinion. The ALJ concluded that his "indication of fair to poor abilities are inconsistent with the longitudinal record." (Tr. 25). This is an accurate characterization of the record. As discussed below, Plaintiff reported some subjective complaints to Dr. Fremont that were denied throughout the treatment record. *Infra*. Moreover, Dr. Fremont's mental status examination contradicts essentially all of the mental status examinations by treatment providers. For instance, Dr. Fremont indicated that Plaintiff had "almost no insight" and her judgment was questionable and poor. (Tr. 292). However, on October 4, 2010, December 14, 2010, January 4, 2011, February 24, 2011, March 31, 2011, May 5, 2011, June 3, 2011, June 30, 2011, July 28, 2011, October 27, 2011, November 22, 2011, December 2, 2011, January 19, 2012, February 16, 2012, March 15, 2012, April 16, 2012, July 13, 2012, July 31, 2012, August 22, 2012, and October 26, 2012, either Dr. Sharma or CRNP O'Boyle observed that Plaintiff's insight was "good" and her judgment was either "good" or "intact," and not "poor" or "questionable." (Tr. 379-99). Even on January 2, 2013, when Plaintiff was referred to partial hospitalization, and January 3, 2013, when she underwent intake for partial hospitalization, providers observed that her insight was good and her judgment was intact or good. (Tr. 464, 473). Later that day, a new psychiatrist indicated that her insight and judgment were questionable, but this was

during an exacerbation of symptoms eighteen months after Dr. Fremont's examination. (Tr. 463).

The Court also notes that Dr. Fremont's examination findings are ambiguous. (Tr. 293-94).  Dr. Fremont did not directly address the Listings, complete an RFC assessment, or assess whether Plaintiff's limitations were marked or moderate. (Tr. 293-94). Dr. Fremont opined that Plaintiff's functional abilities were poor, fair to poor, fair, or good, but does not define any of these terms. (Tr. 293-94). There is no evidence that a "poor" ability correlates with a marked, rather than moderate, impairment. Doc. 11. Instead, Dr. Fremont opined that Plaintiff's GAF was 55, which means that neither her symptoms nor her functional impairment was more than moderate. (Tr. 292). Dr. Murphy, in contrast, specifically evaluated the Listings, completed an RFC, and assessed whether Plaintiff's limitations were marked or moderate. (Tr. 295-311). An ALJ may credit a more specific opinion over a less specific opinion. *See* 20 C.F.R. §404.1527(c)(3).

The ALJ also assigned less weight to Dr. Fremont's opinion regarding fair to poor abilities because it was based on Plaintiff's subjective complaints. (Tr. 23-25). This is an accurate characterization of the record. Dr. Fremont memorialized Plaintiff's subjective report of function:

> The effect of her impairment on function indicates that she does very little. She stops only occasionally and if accompanied by someone. She cannot pay bills. She cannot cook but is able to warm soup. She will not use the microwave. She does not clean nor does she do the dishes. She simply sits all day. Does not read; does not watch television. She does not socialize and

does not talk to neighbors. She does play games on the computer but does not know how to look up information or check e-mails on the computer.

(Tr. 293). However, "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion." *Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003)(citing *Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996)). Plaintiff's testimony and subjective reports support her claims, but as discussed above, the ALJ properly found that her testimony was not fully credible. *Supra.* "An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted." *Id.* (citing *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.")).   Several of the specific subjective claims Plaintiff made to Dr. Fremont are contradicted by almost all of the treatment records. For instance, Dr. Fremont noted in May of 2011 that Plaintiff reported sleep disturbance. (Tr. 292). However, Plaintiff reported that her sleep was "normal" to CRNP O'Boyle or Dr. Sharma at visits on October 4, 2010, December 14, 2010, January 4, 2011, February 24, 2011, May 5, 2011, June 30, 2011, July 28, 2011, November 22, 2011, December 2, 2011, January 19, 2012, Feburary 16, 2012, March 15, 2012, April 16, 2012, July 13, 2012, and July 31, 2012. (Tr. 379-99). For instance, on December 14, 2010, Plaintiff reported "no

sleep problems," and on April 16, 2012, Plaintiff reported that her sleep "remains" good. (Tr. 398, 484). In August of 2012, Plaintiff reported that "some days, she may have a little difficulty sleeping," but by October 26, 2012, she was reporting that her sleep was "normal" again. (Tr. 379-80). Even when Plaintiff was referred for partial hospitalization due to an exacerbation of symptoms on January 2, 2013, she reported normal sleep. (Tr. 464). Similarly, Plaintiff reported to Dr. Fremont that her appetite varies. (Tr. 292). On the same treatment dates with CRNP O'Boyle or Dr. Sharma listed above, Plaintiff denied any increased or decreased appetite. (Tr. 379-99). For instance, on December 14, 2010, she reported "no appetite problems," on June 3, 2011 she reported her appetite was "fine," on December 21, 2011, she reported "no appetite change," and on April 16, 2012, she reported that her appetite "remains" good. (Tr. 384, 398-99). The ALJ properly discounted Dr. Fremont's opinion for being based on Plaintiff's less than fully credible subjective claims. Plaintiff cannot demonstrate that no reasonable person would have resolved the conflict in opinions from May of 2011 in favor of Dr. Murphy, who reviewed a complete record through that date, over Dr. Fremont. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).

This case is similar to *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011), where the Third Circuit held that an ALJ properly rejected statements from an unacceptable medical source when there were no treating source medical opinions and there was a non-examining, non-treating opinion that supported the ALJ's denial. *Id.* at

360-63. Even if Dr. Fremont's examination, along with the statements from unacceptable sources, supported Plaintiff's claim, Dr. Murphy's opinion and the treatment record provide substantial evidence to the ALJ's assessment. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). The question is not whether substantial evidence supports Plaintiff's claims, or whether there is evidence that is inconsistent with the ALJ's finding. *Id.* Substantial evidence could support both Plaintiff's claims and the ALJ's finding because substantial evidence is less than a preponderance. *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If substantial evidence supports the ALJ's finding, it does not matter if substantial evidence also supports Plaintiff's claims. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).  Plaintiff cannot demonstrate that no reasonable person would have resolved the conflict in evidence in favor of Dr. Murphy's opinion. *Id.* The Court does not remand on these grounds.

### c.  Listing

Plaintiff asserts that she meets the Listings. (Pl. Brief at 4-8). The Listing criteria at step three establish presumptive disability for some impairments, representing "a higher level of severity than the statutory standard." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). The claimant must meet all of the specified criteria to meet a Listing. *See* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3); *Benway v. Colvin*, 3:11-CV-02233, 2013 WL 3989149, at *15 (M.D. Pa. Aug. 2, 2013) ("a claimant has the burden of proving that his

or her severe impairment or impairments meet or equal a listed impairment") (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Each Listing cited by Plaintiff requires her to demonstrate that she meets the Paragraph B criteria, which requires a marked limitation in at least two areas out of activities of daily living, social functioning, or concentration, persistence, and pace. (Pl. Brief at 4-8). A marked impairment is one that "interfere[s] seriously with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.

Plaintiff asserts that the ALJ "cherry pick[ed]" the facts in discussing the Listings and that Dr. Fremont's opinion, Plaintiff's longitudinal treatment record, and Ms. Wittar's statement support her claim that she meets a Listing. (Pl. Brief at 4). Plaintiff cites Dr. Fremont's opinion. (Pl. Brief at 7). Dr. Fremont opined that Plaintiff's functional abilities were poor, fair to poor, fair, or good, but does not define any of these terms. (Tr. 293-94). There is no evidence that a "poor" ability correlates with a marked, rather than moderate, impairment. Doc. 11. Instead, Dr. Fremont opined that Plaintiff's GAF was 55, which means that neither her symptoms nor her functional impairment was more than moderate. Dr. Fremont's examination does not support Plaintiff's Listing Claim. Regardless, as discussed above, the ALJ reasonably relied on Dr. Murphy, who opined that Plaintiff did not meet a Listing. (Tr. 295-311). Plaintiff cites her testimony, but as discussed above, the ALJ properly found that her subjective claims were not fully

credible. *Supra.* Plaintiff cites Ms. Wittar's opinion, but as discussed above, the ALJ properly resolved the conflict in opinions in favor of Dr. Murphy. Plaintiff fails to demonstrate that no reasonable person would find that she did not meet the strict requirements of the Listing. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). The Court does not remand on these grounds.

## V.    Conclusion

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, a reasonable mind might have denied Plaintiff benefits. The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: October 7, 2016                    _____s/Gerald B. Cohn_____
                                          GERALD B. COHN
                                          UNITED STATES MAGISTRATE JUDGE